**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DEAN L. CIROCCO, DMD<br><br>Plaintiff,<br><br>v.<br><br>PREMIER CARE DENTAL MANAGEMENT, LLC and PREMIER CARE DENTISTRY OF PENNSYLVANIA, LLC,<br><br>Defendants. | CIVIL ACTION |

**COMPLAINT FOR DECLARATORY JUDGMENT**

This declaratory action seeks to prevent Defendants Premier Care Dental Management, LLC ("Premier Management") and Premier Care Dentistry of Pennsylvania, LLC ("PCDPA") from restricting Dean L. Cirocco, DMD from earning a living and providing quality dental care to patients based on an unenforceable restrictive covenant. Dr. Cirocco sold the dental practice to Defendants on April 10, 2024, became a PCDPA employee, and agreed to permit PCDPA to provide dental services from the building he owned (the "Premises"). As part of that transaction, Dr. Cirocco agreed not to practice dentistry within ten miles of the Premises for five years. Defendants subsequently closed the practice at the Premises, vacated the Premises, and terminated the lease. Despite no longer operating at the Premises, Defendants have expressly refused to permit Dr. Cirocco to practice at the very building he owns—demanding instead that he "buy his way out" of the covenant. This creates a justiciable controversy warranting declaratory relief.

**PARTIES**

1. Plaintiff Dean L. Cirocco, DMD is an individual and licensed dentist domiciled in the Commonwealth of Pennsylvania.

2. Defendant Premier Care Dental Management, LLC is a New York limited liability company, with its principal location at 3333 New Hyde Park Road, New Hyde Park, New York 11042. Upon information and belief, no member of Premier Management is a citizen of the Commonwealth of Pennsylvania.

3. Defendant Premier Care Dentistry of Pennsylvania, LLC is a Pennsylvania professional service limited liability company with its principal location at 3333 New Hyde Park Road, New Hyde Park, New York 11042. Upon information and belief, no member of PCDPA is a citizen of the Commonwealth of Pennsylvania.

4. Upon information and belief, Premier Management and PCDPA are related entities under common ownership and control.

**JURISDICTION AND VENUE**

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Dr. Cirocco is a citizen of the Commonwealth of Pennsylvania. No member of either Defendant LLC is, upon information and belief, a citizen of the Commonwealth of Pennsylvania. The amount in controversy exceeds $75,000 based on the value of Dr. Cirocco's right to practice dentistry at his Premises and Defendants' threatened enforcement of a covenant arising from a transaction valued in excess of $75,000.

6. This Court has personal jurisdiction over Premier Management and PCDPA because both entities are registered to do business in the Commonwealth of Pennsylvania and do, in fact, regularly conduct business within the Commonwealth of Pennsylvania.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the real property at issue is located in Lehigh County, Pennsylvania, within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this District.

8. This Court has authority to issue declaratory relief under 28 U.S.C. § 2201(a).

**FACTUAL ALLEGATIONS**

**Dr. Cirocco's Dentistry Background**

9. Dr. Cirocco received his bachelor's degree from Kutztown University before pursuing dentistry aspirations at Temple University School of Dentistry.

10. After receiving his Doctor of Dental Medicine degree, Dr. Cirocco worked as an associate in various practices until 2003, when Dr. Cirocco opened Cirocco Dental Center, located at 5280 Route 309, Center Valley, Pennsylvania 18034.

11. For the next 20 years, Dr. Cirocco worked tirelessly to provide patients with family and cosmetic dentistry services, including: general dentistry, dental implants, teeth whitening, crowns, dentures, root canals, and endodontic treatments.

**The Asset Purchase Agreement, Employment Agreement, and Lease Agreement**

12. In those 20 years, Dr. Cirocco gained the trust of his patients by providing exceptional dentistry services and building a substantial practice.

13. In 2024, Dr. Cirocco's practice garnered the attention of Defendants, who approached Dr. Cirocco and began negotiations to purchase Dr. Cirocco's dental practice, Cirocco Dental Center.

14. On April 10, 2024, Premier Management ("Purchaser"), PCDPA, and Dr. Cirocco entered into the APA. A true and correct copy of the APA is attached hereto as **Exhibit A**.

15. As part of the APA, PCDPA agreed to hire Dr. Cirocco as a PCDPA employee and both parties entered into an Employment Agreement governing the terms and conditions of Dr. Cirocco's employment with PCDPA. *Id.* at p. 5; Sections 7(a)(iii); 7(b)(iv).

16. The APA provided for the sale of substantially all assets of Dr. Cirocco's dental practice (the "Practice"), including goodwill, located at Dr. Cirocco's facility, 5280 Route 309, Center Valley, Pennsylvania 18034 (i.e., the "Premises").

17. Section 8 of the APA, titled "Accounts Receivable," states as follows:

> **8.** **Accounts Receivable.** Seller shall collect, and be solely entitled to, any and all reimbursements for services rendered by Seller prior to the Closing Date, except for those reimbursements relating to orthodontics (Invisalign) ("Accounts Receivable"), which shall be the sole and exclusive property of Purchaser. Any monies collected on account of any accounts receivable for services rendered after the Closing Date or which are reimbursements related to orthodontics (Invisalign), which are made payable to and/or received by Seller shall be promptly endorsed and/or paid over to Purchaser. A list of Accounts Receivable shall be attached hereto as Schedule 8 as of the Closing Date.

*Id.* at p. 6; Section 8.

18. The APA also included various restrictive covenants. Specifically, Section 16(a) of the APA, titled "Restrictive Covenants," states as follows:

> (a) Except for on behalf of PCDPA or as otherwise agreed to by PCDPA, for a period of five (5) years commencing from the Closing Date (the "Restricted Period"), neither Seller nor [Dr. Cirocco], jointly or severally (collectively, "Restricted Party"), shall, either directly or indirectly practice dentistry as an employee, independent contractor, officer, director, owner or otherwise provide services of a nature similar to the services performed by the Practice, or provide administrative or management services with respect to any dental practice or dental group, in any capacity within ten (10) miles of the Premises ("Restricted Area"), unless on behalf of PCDPA, or otherwise in accordance with the terms of this Agreement.

*Id.* at p. 12; Section 16(a).

19. Per the APA, the closing date was April 29, 2024, and the original length of the Restricted Period would otherwise expire on April 29, 2029. *Id.* at p. 5; Section 6.

20. Per Paragraph 27 of the APA, the terms and conditions of the APA are governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. *Id.* at p. 14; Section 27.

21. Additionally, Paragraph 27 of the APA provides that "[t]he prevailing party in any litigation involving [the APA] shall be entitled to all expenses incurred, including but not limited to, reasonable attorneys' fees, court costs and/or arbitration costs." *Id.*

22. In connection with the APA, on April 10, 2024, Dr. Cirocco and PCDPA entered into an Employment Agreement governing the terms and conditions of Dr. Cirocco's employment with PCDPA. A true and correct copy of the Employment Agreement is attached hereto as **Exhibit B**.

23. Per the Employment Agreement, Dr. Cirocco's employment commenced on April 29, 2024 and would continue for a period of seven years "unless earlier terminated in accordance with the terms set forth" in the Employment Agreement. *Id.* at p. 1; Section 2.

24. The Employment Agreement also included a restrictive covenant limiting Dr. Cirocco's post-employment opportunities, stating, in relevant part:

> (b) Except as otherwise set forth herein, during the Term of this Agreement and during the one (1) year period immediately succeeding termination hereof for any reason, you hereby agree that you shall not, either directly or indirectly practice dentistry as an employee, independent contractor, officer, director, owner or otherwise provide services of a nature similar to the services performed by [PCDPA] in any capacity within a ten (10) mile radius of the Premises, unless on behalf of [PCDPA] or otherwise in accordance with the terms of this Agreement.

*Id.* at p. 5; Section 9(b).

25. Separately, on April 29, 2024, Dr. Cirocco, through his holding company, NDG Real Estate Holdings, LLC, entered into a Lease Agreement with Premier Management and rented Dr. Cirocco's entire building, 5280 Route 309, Center Valley, PA 18034, to Premier Management to allow PCDPA to provide dental services from Dr. Cirocco's building. A true and correct copy of the Lease Agreement is attached hereto as **Exhibit C**.

26. Per the Lease Agreement, the initial term of the lease was seven “Lease Years” as defined by the Lease Agreement, starting on the APA’s Closing Date. *Id.* at p. 1; Section 3(a).

**PCDPA Fails to Provide Dr. Cirocco with a Successful Work Environment**

27. On April 29, 2024, Dr. Cirocco began his employment with PCDPA as a general dentist, reporting to Dr. Joshua Gish, President of PCDPA, along with Dr. Scott Asnis, Chief Executive Officer.

28. Despite Dr. Cirocco’s hopes that employment with PCDPA would allow Dr. Cirocco to expand his practice and resources, PCDPA quickly began obstructing Dr. Cirocco’s ability to perform his job duties and earn a living for his family.

29. For example, although the APA permitted Dr. Cirocco to collect Accounts Receivable (A/R) for services rendered prior to the APA’s Closing Date, PCDPA prioritized its business and profits while stripping Dr. Cirocco of the resources he needed to collect payment for services Dr. Cirocco previously provided.

30. Within the first few months of Dr. Cirocco’s employment, PCDPA forced Dr. Cirocco to personally terminate Dr. Cirocco’s Lead Office Manager who had worked with Dr. Cirocco for over 20 years.

31. Overall, PCDPA reduced front desk staff from five to two, significantly hindering the front desk’s ability to manage Dr. Cirocco’s patients’ needs and collect Dr. Cirocco’s A/Rs.

32. Because of the significant reduction in front desk staff, the new Office Manager was overworked, and the general lack of resources available prevented her from properly addressing Dr. Cirocco’s mounting A/Rs.

33. Dr. Cirocco shared his concerns with PCDPA that the replacement Office Manager would not have enough time to work on Dr. Cirocco's A/Rs with her additional duties and responsibilities.

34. In response, PCDPA advised Dr. Cirocco that it would provide Dr. Cirocco additional support to assist Dr. Cirocco in collecting his A/Rs. However, despite PCDPA's promises, no additional personnel was provided.

35. Still, in an effort to be a loyal PCDPA employee, Dr. Cirocco continued performing his job duties and placed his A/R collections on hold to provide PCDPA time to transition its business operations.

36. In or around October 2024, six months after the Closing Date, Dr. Cirocco noticed that legacy patients to whom Dr. Cirocco provided services prior to the APA were continuing to be seen without remitting payment for prior services.

37. On October 16, 2024, Dr. Cirocco emailed Mike Anderson, Chief Development Officer, to express his concerns about the lack of resources PCDPA was providing him. A true and correct copy of the October 16, 2024 Email Thread is attached hereto as **Exhibit D**.

38. In his email, Dr. Cirocco noted that PCDPA had failed to provide additional support to assist Dr. Cirocco in collecting his A/Rs – especially after forcing Dr. Cirocco to terminate his Lead Office Manager – and that, starting November 1, 2024, Dr. Cirocco intended to send his legacy accounts to a collections agency unless PCDPA provided assistance. *Id.*

39. In response, rather than provide support to Dr. Cirocco, Mr. Anderson advised Dr. Cirocco that it was "ultimately" Dr. Cirocco's responsibility to collect his legacy A/Rs and even suggested that Dr. Cirocco pay a staff member to work "off hours" to collect Dr. Cirocco's legacy A/Rs after PCDPA forced Dr. Cirocco to terminate the employee who was the most skilled and able to collect them. *Id.*

40. Dr. Cirocco responded to Mr. Anderson and reiterated his frustrations with PCDPA's contradictory excuses and again advised that he intended to begin referring his legacy A/Rs to a collection agency, beginning November 1, 2024. *Id.*

**Dr. Asnis Begins Unjustly Criticizing Dr. Cirocco For Trying To Collect His A/Rs**

41. After Dr. Cirocco expressed his frustrations with PCDPA's neglect, PCDPA began taking steps to make Dr. Cirocco's employment impossible.

42. Once PCDPA learned that Dr. Cirocco referred legacy patients to a collection agency, Dr. Asnis grew angry with Dr. Cirocco's decision to simply collect payment for services he provided patients nearly a year prior.

43. On December 6, 2024, Dr. Asnis emailed Dr. Cirocco with the title "Not being a good partner," copying Mr. Anderson and Dr. Robert Kolts, SVP Clinical Affairs, and berated Dr. Cirocco for trying to collect his outstanding A/Rs. A true and correct copy of the December 6, 2024 Email is attached hereto as **Exhibit E**.

44. Despite promising Dr. Cirocco assistance with collecting his legacy A/Rs, Dr. Asnis again insisted that the responsibility for doing so lay solely on Dr. Cirocco. *Id.*

45. Rather than fulfilling PCDPA's promises, Dr. Asnis was more concerned with lining his and PCDPA's own pockets at the expense of Dr. Cirocco's livelihood.

46. Even worse, Dr. Asnis disingenuously claimed that PCDPA did not "push out" Dr. Cirocco's Lead Office Manager, claiming that she was going to retire at the end of the year – eight months later. In fact, Dr. Asnis defiantly told Dr. Cirocco that PCDPA "helped problem solve" the manager situation, as if PCDPA did Dr. Cirocco a favor by leaving him without any resources to collect his hard-earned income. *Id.*

47. Rather than engage with Dr. Asnis' efforts to frustrate and anger Dr. Cirocco, Dr. Cirocco chose not to respond to Dr. Asnis to de-escalate the tension.

48. However, Dr. Cirocco's efforts to remain professional only further angered Dr. Asnis, and, on December 17, 2024, Dr. Asnis sent another increasingly aggressive email. A true and correct copy of the December 17, 2024 Email is attached hereto as **Exhibit F**.

49. In his email, Dr. Asnis claimed he was "sick and tired" of Dr. Cirocco "bad mouthing" PCDPA for, again, simply seeking to collect payment for services provided – just as any hardworking individual would do. *Id.*

50. In addition to criticizing Dr. Cirocco for trying to earn a living, Dr. Asnis resorted to criticizing the condition of Dr. Cirocco's office that Dr. Cirocco leased to PCDPA, falsely suggesting that the Premises was in poor working condition. *Id.*

51. Dr. Asnis ended his email by again falsely claiming that "we have done everything we can to support [Dr. Cirocco]" and that all Dr. Cirocco did was complain because he simply wanted to collect payment that was rightfully owed to him.

**Dr. Cirocco's Complaints Result in the Termination of His Employment**

52. After Dr. Asnis' December 17, 2024 email, it became clear to Dr. Cirocco that PCDPA wanted to terminate Dr. Cirocco's employment.

53. Fearing that he had no other choice, Dr. Cirocco reluctantly signed a Separation Agreement and agreed to separate his employment with PCDPA, effective December 27, 2024. A true and correct copy of the December 31, 2024 Separation Agreement is attached hereto as **Exhibit G**.

54. As of the time of Dr. Cirocco's employment termination, Dr. Cirocco had over $40,000 in outstanding A/Rs.

55. Per the Separation Agreement, Dr. Cirocco and Premier Management agreed to a limited waiver of Dr. Cirocco's non-competition restrictions in both the APA and the Employment Agreement to allow Dr. Cirocco to practice dentistry at Albright Dental Practice,

located at 2804 Walbert Avenue, Allentown, PA 18104, less than 10 miles from the Premises. *Id.* at p. 4; Section 7.

56. Dr. Cirocco's post-employment non-compete obligations under the Employment Agreement expired December 27, 2025.

**PCDPA Ceases Operations at the Premises and Vacates the Premises**

57. After Dr. Cirocco separated from PCDPA, Dr. Cirocco began practicing at Albright Dental Practice while abiding by all other post-employment obligations under both the APA and Employment Agreement.

58. On December 5, 2025, Dr. Cirocco received an automated email from PCDPA stating that PCDPA would be moving its practice from the Premises to a wholly different office – the Quakertown Family Dental Center – on December 8, 2025. A true and correct copy of the December 5, 2025 Email is attached hereto as **Exhibit H**.

59. After closing PCDPA's practice at the Premises, Premier Management terminated its lease with Dr. Cirocco, effective January 30, 2026.

60. The Premises has remained unoccupied for eight months.

**The APA's Non-Competition Restrictions Are Unenforceable Because PCDPA Has Vacated the Premises**

61. The non-competition obligation in Section 16(a) of the APA clearly limits the scope of Dr. Cirocco's non-competition obligations to locations within 10 miles of the Premises located at 5280 Route 309, Center Valley, PA 18034. *See* Ex. A.

62. Defendants may only enforce Dr. Cirocco's non-competition obligations in Section 16(a) of the APA to the extent that it furthers PCDPA's legitimate business interest, i.e., PCDPA's dentistry services provided at the Premises.

63. Indeed, Section 16(a) of the APA does not restrict Dr. Cirocco from working within any geographic distance of *any other PCDPA location*, including Quakertown Family Dental Center. *Id.*

64. Once PCDPA ceased business operations at the Premises, PCDPA no longer had a legitimate business interest to protect, rendering Section 16(a) of the APA unenforceable.

**Dr. Cirocco Seeks a Limited Waiver to Practice at the Premises, but Defendants Erroneously Deny Dr. Cirocco's Request**

65. In light of Defendants' decision to cease operations and vacate the Premises, Dr. Cirocco decided that he would like to expand his practice back to the Premises (that he owns).

66. To that end, on April 23, 2026, Dr. Cirocco, through counsel, requested that Defendants agree to a limited waiver of Dr. Cirocco's non-competition obligations under the APA to the extent necessary to allow Dr. Cirocco and/or his dental practice to provide dental services at the Premises. A true and correct copy of the April 23, 2026 Correspondence is attached hereto as **Exhibit I**.

67. As a good faith and reasonable gesture, Dr. Cirocco expressly proposed to maintain all other APA obligations. *Id.*

68. Defendants, through their General Counsel and Chief Administrative Officer, Jennifer Kirschenbaum, refused the request and threatened litigation, stating: "We disagree. We very much have a legitimate business concern and will be presenting that argument if challenged in court. He can buy his way out." A true and correct copy of the April 23, 2026 Email Thread is attached hereto as **Exhibit J**.

69. In response to Dr. Cirocco's counsel advising Ms. Kirschenbaum that Dr. Cirocco does not have a monetary offer, Ms. Kirschenbaum further stated: "The answer is no. We will suffer patient attrition and we paid substantial value for protection from this specific location. He can make a reasonable monetary offer for us to consider. We will expend resources to protect our legitimate business interest. Be advised." *Id.*

70. Defendants' unequivocal refusal to permit Dr. Cirocco to practice at the Premises and express threat to litigate to enforce the APA's unenforceable non-competition obligations against him establishes an actual, justiciable controversy between the parties.

71. The continued enforcement of Section 16(a) as to the Premises, which Defendants have permanently vacated, serves no legitimate protectable interest.

72. Defendants voluntarily closed PCDPA's practice at the Premises.

73. Defendants no longer derive any competitive benefit from the Premises, yet Defendants seek to unjustifiably prevent Dr. Cirocco from using his own building to practice his profession despite already permitting Dr. Cirocco to practice dentistry at a location less than 10 miles from the Premises.

74. Moreover, Dr. Cirocco's separation from PCDPA amounted to an involuntary termination. Dr. Cirocco did not wish to leave PCDPA; rather, PCDPA forced Dr. Cirocco's hand by making Dr. Cirocco's employment so objectively intolerable that Dr. Cirocco, as would any reasonable person in his position, felt that he had no other choice but to accept separation of his employment with PCDPA. Thus, as a matter of Pennsylvania law, Dr. Cirocco's involuntary termination further renders his non-competition obligations in the APA unenforceable.

75. Finally, Dr. Cirocco is one of the few dentists who accepts insurance coverage for dental services in this area, and, if Dr. Cirocco is unable to practice dentistry at the Premises, the detrimental impact and hardship on the public and dental patients in that area outweigh Defendants' interests in enforcing a non-competition obligation for a location at which PCDPA no longer conducts business.

76. Accordingly, a judicial declaration that Dr. Cirocco is permitted to practice dentistry at the Premises – whether through his own practice or as an employee or associate of an unaffiliated dental organization – is appropriate in these circumstances.

77. Without such a declaration, PCDPA's threats against Dr. Cirocco, despite having no legitimate business interest in preventing Dr. Cirocco from practicing dentistry at the Premises, will continue to cost Dr. Cirocco tens of thousands of dollars in lost services provided to dental patients.

**COUNT I**
**DECLARATORY JUDGMENT**
**(28 U.S.C. § 2201(a))**

78. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

79. Plaintiff respectfully seeks to have this Court declare that Plaintiff is entitled to practice dentistry at the Premises for the reasons set forth more fully herein.

80. Plaintiff files for declaratory judgment to prevent the accrual of avoidable damages.

81. Plaintiff's claim is ripe for adjudication.

82. Plaintiff and Defendants have adverse interests in this action, and an actual controversy exists between Plaintiff and Defendants regarding whether APA Section 16(a) is enforceable, under the present circumstances, to prevent Plaintiff from practicing dentistry at the Premises—a location Defendants have voluntarily and permanently abandoned.

83. The controversy between Plaintiff and Defendants is substantial, immediate, and real.

84. Under Pennsylvania law, a covenant not to compete is enforceable only to the extent reasonably necessary to protect a legitimate business interest. Where the promisee has abandoned the specific location anchoring the geographic restriction and no longer operates there, enforcement of the covenant as to that location serves no protectable interest and constitutes an unreasonable restraint on the promisor's livelihood.

85. Defendants purchased the goodwill of a dental practice at the Premises. They received the benefit of that bargain. Defendants then chose to close the practice, terminate the lease, and vacate the Premises. No patient, no staff member, and no business operation of either Defendant remains at or near the Premises.

86. Continued enforcement of Section 16(a) to bar Plaintiff from practicing at the Premises does not protect any legitimate competitive interest of Defendants. It merely prevents Plaintiff from using his own property to practice his profession, while conferring no corresponding benefit on Defendants.

87. In the alternative, to the extent the Court determines that Section 16(a) is not per se unenforceable under these circumstances, the Court should exercise its authority under APA Section 16(d) and Pennsylvania law to equitably reform and narrow the Noncompetition Covenant to permit Plaintiff to practice dentistry at the Premises, whether as an owner, sole practitioner, or employee or associate of an unaffiliated dental organization.

88. A declaratory judgment will serve the useful purpose of clarifying the legal relations between the parties and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Dean L. Cirocco respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

(a) A declaration that APA Section 16(a) is unenforceable under the present circumstances to the limited extent it prevents Dr. Cirocco from practicing dentistry at 5280 Route 309, Center Valley, Pennsylvania 18034 (the "Premises"), whether through his own practice, as a sole practitioner, or as an employee or associate of an unaffiliated dental organization;

(b) In the alternative, a declaration that APA Section 16(a) should be equitably reformed and narrowed to permit Dr. Cirocco to practice dentistry at the Premises in any capacity;

(c) A declaration that this limited relief does not affect, diminish, or otherwise disturb Dr. Cirocco's other surviving obligations under the APA, the Separation Agreement, or any other agreement between the parties, including without limitation the non-solicitation, confidentiality, patient-record, and other obligations contained therein;

(d) An award of attorneys' fees, costs, and litigation expenses pursuant to APA Sections 16(c) and 27; and

(e) Such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Immon Shafiei*
Daniel P. O'Meara, Esq.
Immon Shafiei, Esq.
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
1735 Market Street, Suite 3000
Philadelphia, PA 19103
Tel: (215) 995-2800
dan.omeara@ogletree.com
immon.shafiei@ogletree.com
*Attorneys for Plaintiff*

Dated: October 2, 2026